[Civ. No. 16833. First Dist., Div. One. July 15, 1957.]

JOHN M. MILTON, Plaintiff and Appellant, v. HUDSON SALES CORPORATION (a Corporation) et al., Defendants and Appellants; DONALD C. REATH, Respondent.

Stanley E. Sparrowe and Stark & Champlin for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Eugene M. Prince and John B. Bates for Defendants and Appellants.

Fernhoff & Wolfe and Cameron W. Wolfe for Respondent.

PETERS, P. J.—In 1949 John Milton, a former Hudson automobile dealer in East Oakland, filed the complaint that ultimately resulted in the judgments and orders from which

the appeals here involved have been taken. The fourth amended complaint, upon which the cause proceeded to trial, alleges two causes of action, the first for breach of contract, and the second for damages for a violation of the Cartwright Act. (Bus. & Prof. Code, §§ 16700-16758.)

The first cause of action names Hudson Sales Corporation, a wholly owned subsidiary of the corporation that manufactures Hudsons, as the sole defendant. It charges that from September 15, 1948, to September 30, 1949, Hudson, in bad faith, failed to supply Milton with his reasonable requirements of new cars in violation of the terms of the contract between them.

The second cause of action is a double damage claim under the Cartwright Act, alleging a conspiracy to restrain trade by not continuing Milton as a Hudson dealer after his contract expired in 1949. It names as defendants Hudson; two of its employees — Young and VanDerzee; a former employee — Lawson; the Walter W. Anderson Company—another Hudson dealer in East Oakland; Walter W. Anderson—the former manager and chief owner of that company; and Donald C. Reath, a former employee of Anderson.

Prior to trial Anderson and his company secured a dismissal of the action against them for lack of prosecution. The jury awarded Milton $35,750 against Hudson on the first cause of action. Hudson appeals from the judgment entered on that verdict. On the second cause of action the jury's verdict was in favor of defendant Reath, and Milton appeals from the judgment on that verdict. As to the other four defendants, Hudson, Lawson, Young and VanDerzee, the jury found a conspiracy to restrain trade, and fixed Milton's damages as $50,000 (which, doubled, means an award of $100,000). Judgment was entered on these verdicts. Thereafter, the trial court, as to the second cause of action, granted the four defendants a new trial. Milton appeals from the order granting the new trial. The four defendants against whom judgment had been entered on the second cause of action, appeal from that judgment. Thus, there are four appeals before us. The reporter's transcript totals nearly 2,500 pages, while the briefs exceed 300 pages.

## The Contract Action

The first cause of action alleges that prior to 1948 Milton had been a dealer for an independent distributor of Hudson automobiles in East Oakland; that on September 15, 1948, Milton, as dealer, and Hudson, as distributor, executed a "Hudson Dis-

tributor-Master Dealer Sales Agreement''; that said agreement was to expire July 31, 1949, but was later extended to September 30, 1949; that this agreement contained an obligation on the part of Hudson to sell Milton new Hudson automobiles sufficient to meet the requirements of his dealership; that Hudson, in bad faith, breached that obligation. Hudson's defense was that the contract expressly provided that Hudson should not be liable for any failure on its part to deliver automobiles for any reason, and that, in any event, it did not act in bad faith.

The trial court ruled that the interpretation of the contract was a question of law, and instructed that Hudson ''by its contract impliedly agreed to sell to . . . [Milton] at the latter's specific request or order periodically new Hudson automobiles in quantities sufficient to meet . . . [Milton's] need and requirements thereof for resale by . . . [Milton] at retail during the period covered by the contract.''

The court also instructed that ''[i]f, after determining what . . . [Milton's] needs and requirements were, you find . . . that . . . [Milton] actually attempted to buy from . . . [Hudson] his needs and requirements, and that . . . [Hudson] not acting in good faith refused to sell . . . [Milton] his needs and requirements, then, in such event, . . . [Hudson] would be guilty of a breach of his contract, and would be liable for any damages proximately caused by such breach.''

The principal question presented on this appeal is whether the contract, properly interpreted, did contain an implied obligation on the part of Hudson to fill, except as excluded by the contract, the reasonable needs and requirements of Milton for new cars.

The contract is in two parts. The first part is quite short and is entitled ''Hudson Distributor-Master Dealer Sales Agreement.'' It incorporates a ''Supplement,'' which is quite lengthy and contains most of the major terms and conditions of the contract.

It was the theory of Hudson at the time of trial, and it now urges on this appeal, that this contract not only did not contain an implied or express obligation on the part of Hudson to sell to Milton enough cars to meet his requirements, but, in fact, contained a provision expressly excluding any such obligation. The provision relied upon is paragraph 2(a) of the Supplement. It reads: ''2(a) Notwithstanding acknowledgment or acceptance by Distributor . . . [Hudson] of any order placed by Master Dealer [Milton], Distributor shall in

no event be liable to Master Dealer for any loss or damage because of failure of Distributor to ship or fill such order, regardless of any express or implied provision to the contrary in this agreement."

It is Hudson's position that by this clause, by express agreement, the two contracting parties agreed that, regardless of the reason, and regardless of whether Hudson acted in good or bad faith, Hudson was not to be liable for failing to ship cars to Milton. The trial court, by its instructions, determined that, as a matter of law, there was an implied obligation to furnish cars to Milton. It is argued that in view of paragraph 2(a), under the law, an implied obligation cannot be raised. Hudson relies on cases to the effect that an obligation can never be implied that is contrary to the express terms of the contract, and on cases which hold that by implication the court cannot supply a covenant covering a matter intentionally excluded from the contract. (See *Stockton Dry Goods Co.* v. *Girsh,* 36 Cal.2d 677 [227 P.2d 1, 22 A.L.R.2d 1460] ; *Cousins Inv. Co.* v. *Hastings Clothing Co.,* 45 Cal.App.2d 141 [113 P.2d 878].) It is argued that it is absurd to say that the language used in the entire contract shows so clearly that this was to be a "requirements" contract that it was unnecessary to express it, particularly when section 2(a) repudiates the concept of a "requirements" contract.

Milton does not quarrel with the general rule that no promise may be implied against the express terms of a contract, or with the other rules cited by Hudson, but contends that the contract, when read as a whole, compels the implying of the promise. He cites many well-reasoned cases holding that the right to sell cars conferred by contract implies a promise to supply those cars, and that a promise to buy and promote the sale of cars implies a correlative promise by the other party to supply the cars. Hudson replies that, under the contract, Milton was not obligated to take or order any cars from Hudson, and therefore it would be one-sided and unreasonable to imply a duty to supply cars to Milton.

These contentions require an examination of the terms of the contract and its supplement. The supplement, in particular, is much too long to quote at length, but there are many provisions that demonstrate that the parties contracted on the theory that Hudson would supply, and be required to supply, cars to Milton, unless in good faith it asserted a good excuse.

The contract itself in section 1 provides :

"The purpose of this agreement is to provide a working

arrangement under which Distributor and Master Dealer will carry on their business relations with each other."

Section 3 (b) provides: "No verbal understandings or representations of any nature, relating to this agreement or to any of the subject matter of this agreement, will be recognized or considered valid."

Then follow provisions limiting the power of each contracting person to represent the other. Next follows a section requiring Milton "to the best of his ability promote the sale and servicing of Hudson products, and will perform under this agreement to the satisfaction of Distributor." Hudson products will be purchased by Milton, and he agrees to keep on hand at all times eight new Hudsons.

The supplement is divided into seven main divisions. The first of these is entitled "Sales and Shipment Conditions"; the second is headed "Price Provisions"; the third, "Infringements"; the fourth, "Service, Parts and Accessories"; the fifth, "Operating Requirements"; the sixth, "Termination"; and the seventh, "Limitations, Laws, Definitions, etc." These main divisions are divided into 50 subdivisions, and many of the subdivisions are again divided into sub-subdivisions. Many of these provisions have no relevancy to our present problem, but several of them do. Section 1 of the supplement provides that Hudson will not ship any automobiles to Milton except upon Milton's specific order. Subdivision 2(a) has been quoted above. Section 2(b) provides that if Milton orders a car with optional equipment that Hudson does not have readily available, Hudson may cancel the order for the optional equipment and fill the order with a car without such equipment. Section 3 provides: "If any order specified for any designated weekly shipping period is not manufactured within three weeks after the end of that period, then either Distributor or Master Dealer may cancel the order provided Hudson is notified of the cancellation before the order is actually shipped from the factory, both parties being free of further liability or responsibility thereon after such cancellation."

Section 6 provides that if Milton fails to make prompt payment for the ordered automobiles Hudson shall have the right to divert shipments of cars ordered by Milton to other dealers, and Milton shall be responsible for any extra costs thus incurred by Hudson. By section 7 Hudson reserves the right to change the design of any of its products or to discontinue any of its models, and if it changes any of its models Hudson

shall not be required to make changes on cars previously shipped to Milton.

Paragraphs 37 to 42 deal with termination. These sections contain detailed provisions defining the causes for, the consequences of, a cancellation of the contract by either party. Thus, section 37 recognizes that other than by mutual consent either of the parties may desire to terminate the agreement. Section 38 confers the right on Milton to cancel the contract at any time on 30 days' written notice. The next section (39) confers the right to cancel on Hudson, on 90 days' written notice, if Milton should fail to develop his territory to Hudson's satisfaction, or should fail to perform any other condition of the contract to Hudson's satisfaction. This same section also confers on Hudson the right to terminate the contract at once for some 10 specified reasons. Section 40 provides 7 detailed circumstances under which automatic termination shall occur. Section 41 contains 9 subdivisions labelled "a" to "i" inclusive, providing for "Miscellaneous Termination Details." Section 41(b) provides that during any termination notice period Hudson "will determine to what extent . . . [Milton's] orders for automobiles and other Hudson products will continue to be filled," and that a termination of this agreement operates as an automatic cancellation of all unfilled orders. Subdivision (c) exempts either party from damage "by reason of any termination of this agreement" when the termination is made either according to the agreement, or for any just cause, or for certain other reasons. Section 41(g) is also mentioned by the parties. It provides: "If during the termination notice period of Hudson's sales agreement with Distributor, Distributor fails or is for any reason unable to furnish Master Dealer with an adequate supply of automobiles, Hudson or someone designated by Hudson may supply automobiles directly to Master Dealer."

Section 43 is the last section necessary to discuss. It provides: "The obligations of Distributor under this agreement are subject to the requirements of other dealers; also to the inability of Distributor to obtain automobiles, accessories or parts from Hudson, and to regulations or orders of any governmental agency, and to delay or failure of performance for any cause whatsoever not reasonably within Distributor's control, and to all other conditions and limitations set forth in this agreement."

When this contract is read as a whole, it is quite clear that section 2(a) is ambiguous. If section 2(a) was intended to

relieve Hudson from any liability for the selling of any cars at all to Milton, why was it necessary to insert these many and detailed provisions to which reference has been made? What is the meaning of these clauses? Why, for example, if there was no obligation to sell, was it necessary to insert paragraph 43 which necessarily implies an obligation to sell limited only by the specified qualifications? The clause would seem to have meaning only as it relates to an obligation to sell cars, parts and accessories to Hudson. If there was no obligation to sell cars, why was it necessary to provide in section 41(b) that Hudson, during termination notice periods, should be free of liability? The obvious implication of the section is that except during a notice period, subject to other limitations in the contract, Hudson was obligated to sell Milton his requirements of cars. Section 41(g), quoted above, contains another provision constituting a further recognition of Hudson's obligation to fill Milton's requirements. All of the detailed provisions for cancellation (§§ 37-42) necessarily imply that Milton possessed some rights to cars which were to be cut off by cancellation. The several other provisions quoted and referred to above all contain the direct implication that Hudson, subject to the other terms of the contract, was obligated to fill Milton's orders for cars during the term of the contract.

When these various factors are considered it is obvious that the precise meaning of section 2(a) is by no means as clear as Hudson would have us believe. Milton interprets it as conveying the thought that Hudson was not to be bound for an occasional failure to fill an accepted order. It is argued that that is the only additional protection Hudson needed because paragraph 43 protected it when the demands of other dealers made delivery of cars to Milton impractical. To interpret section 2(a) in any other fashion, so it is contended, would mean that the contract was meaningless because Hudson could sell or not sell at its pleasure.

We are impressed with the arguments of Milton on this issue of interpretation. If the contract had contained a clear-cut statement that Hudson was to be under no duty at all to sell cars to Milton, and could, even in bad faith, and with intent to injure Milton, refuse to sell him cars, would any reasonable businessman have signed it? ▇ Of course, there is an implied covenant in all contracts that the parties will act in good faith. Hudson's interpretation would violate such a covenant. ▇ It also must be remembered that Hudson drafted the

exculpatory clause, and that the rule of construction is that such a clause so drafted must be construed against the drafter.

The case law is not too helpful on the subject under discussion. This is so because the terms of the contracts involved in the various cases differ, and because the opinions in many cases do not disclose all of the applicable terms of the contracts under consideration.

There are cases holding, directly or by way of dicta, that a clear-cut nonliability clause will be enforced. (*F. H. McClintock Co.* v. *Truxell Sales & Service*, 297 Mich. 284 [297 N.W. 493]; *Standard Motor Co.* v. *Shockey*, 139 Md. 127 [114 A. 869]; *Kilker* v. *Ford Motor Co.*, 39 S.D. 293 [164 N.W. 57]; *Studebaker Corp. of America* v. *Wilson*, 247 F. 403 [159 C.C.A. 457], and others.) But there are other well-reasoned cases holding to the contrary. The theory of these cases is well expressed in the following extract from *Marrinan Medical Supply* v. *Ft. Dodge Serum Co.*, 47 F.2d 458, 462, where the clause in question required all orders to be "approved" by the seller: ". . . the clause in question did not give plaintiff the right to reject orders arbitrarily. This is shown conclusively by the provision that the plaintiff should not be liable for failure to fill orders when such failure arose from act of God, fire, strikes, shortage of material, or any other matter over which plaintiff had no control. Such a provision would have been unnecessary if plaintiff possessed an arbitrary right of refusal to approve orders."

The case of *Jay Dreher Corp.* v. *Delco Appliance Corp.*, 93 F.2d 275, written by Judge Learned Hand of the Second Circuit, seems closest in point to the instant case, and, as is to be expected from Judge Hand, is ably and carefully reasoned. There the appellate court reversed a judgment dismissing a complaint for insufficiency upon its face. There, as in the instant case, the defendant manufacturer granted the plaintiff a "franchise to sell" certain products. Plaintiff accepted the franchise, agreed to make all sales in accordance with the terms of the agreement and to carry on its business to the satisfaction of the defendant. The court described the nonliability clause as follows: " 'All orders . . . received . . . by Company are subject to acceptance by Company' and the defendant agrees 'to fill accepted orders as promptly as practicable,' but the plaintiff 'expressly releases Company from liabilities for any loss or damage arising from failure of Company to fill any orders of Distributor.' " (93 F.2d at p. 276.)

That clause is substantially similar to paragraph 2(a) here involved.

Plaintiff alleged that the contract was breached by defendant's appointment of another dealer in the franchised area. Defendant argued that the nonliability clause above-quoted exempted it from any liability; that since it had the power to fill any orders it had the power to refuse all orders; that what it could do in detail it could do in gross. Therefore, so it was argued, the breach of its promise not to employ other dealers in the area, could result in no loss. The court's reply was pointed, clear, and sound. It was (93 F.2d at p. 277) "The clause does not, however, give the defendant any such power; it follows immediately upon the clause which declares that all orders which the plaintiff may send, shall be 'subject to acceptance' by the defendant. The release is not from liability for failure to accept, but from failure to fill after acceptance. Its purpose is plain; the plaintiff might make engagements with customers who could hold him if the defendant defaulted, after accepting his corresponding order. All that the clause meant was that he should have no recourse over for his loss in such a case; it was an excuse for nonperformance to be exercised bona fide, not a privilege to repudiate. A stronger argument might be drawn from the defendant's reserved power to refuse any specific order; by analogous reasoning if it might do that, it might declare that it would accept no orders whatever, and thus end the whole contract at once, instead of doing so bit by bit. However, to read that clause so, makes redundant the cancellation clause, which would in that event have been totally unnecessary, and corrupts the reasonable implication of the venture as a whole; which is that the defendant will use an honest judgment in passing upon orders submitted, considering them on equal terms with others it may receive and weighing them against its available supply."

The court noted that the "authorities are not indeed in entire accord with our conclusion, though there is no decisive weight against it" (93 F.2d at p. 277), and then held that the contract so construed was sufficiently definite. In this connection it stated (93 F.2d at p. 278) : " [A]s we have already said, it *was* bound to use an honest judgment regarding . . . [the orders], to give them an equal standing with other orders, considering its production and its entire market. Therefore, the two factors which determined the defendant's performance were the extent of the plaintiff's orders and the extent

to which the defendant could have filled them acting in good faith; each factor is an 'objective standard' within the meaning of the New York decisions which the parties expressly incorporated into their contract.''

We are much impressed with the reasoning and inherent fairness of this decision.

Hudson calls attention to a later case by the same court—*Bushwick-Decatur Motors* v. *Ford Motor Co.*, 116 F.2d 675—and claims that it states a rule favorable to it. This case was written by Judge Clark, and apparently only partially approved by Judge Hand, and Judge Chase only ''concurs in the result.'' This case dealt with a clause in a manufacturer-dealer contract which provided that the contract was terminable ''at anytime at the will of either party by written notice to the other party.'' (116 F.2d at p. 676.) There were no other provisions of the contract inconsistent with this clause. Four and a half years later the Ford Company gave notice of termination. The appellate court affirmed the dismissal of plaintiff's cause of action based on allegations that the ''termination was malicious, in bad faith, and contrary to the custom of the trade, and therefore wrongful.'' (116 F.2d 676.) The court pointed out that in many prior cases decided before the contract involved had been entered into this precise termination clause ''in the same form of contract has been construed to give Ford an unqualified power to terminate the relationship'' (116 F.2d 676) and then followed that rule. At page 677 the court stated: ''With a power of termination at will here so unmistakably expressed, we certainly cannot assert that a limitation of good faith was anything the parties had in mind. Such a limitation can be read into the agreement only as an overriding requirement of public policy.''

As to the applicability of the public policy argument, the court stated (116 F.2d 677) : ''The onerous nature of the contract for the successful dealer and the hardship which cancellation may bring him have caused some writers to advocate it, however; and an occasional case has seized upon elements of overreaching to come to such a result on particular facts. . . . But, generally speaking, the situation arises from the strong bargaining position which economic factors give the great automobile manufacturing companies: the dealers are not misled or imposed upon, but accept as nonetheless advantageous an agreement in form bilateral, in fact one-sided. To attempt to redress this balance by judicial action without legislative authority appears to us a doubtful policy. We

have not proper facilities to weigh economic factors, nor have we before us a showing of the supposed needs which may lead the manufacturers to require these seemingly harsh bargains.''

The applicability of this case to the instant one is not readily apparent. The court certainly did not intend to overrule the Jay Dreher case. In fact, it referred to that case only once, and then with apparent approval. The case deals with a termination clause and not with a clause relating to the claimed obligation to sell products to the dealer. In the instant case we are not only dealing with clause 2(a) of the contract, but with innumerable other clauses, to which reference has already been made, that are not only inconsistent with Hudson's interpretation of paragraph 2(a), but which would be utterly meaningless if that interpretation were to prevail. It is also quite significant that in the Ford case the court was dealing with a clause that had been before the courts many times and had been interpreted quite uniformly many times before the contract was entered into, so that anyone signing such a contract was chargeable with knowledge of what the clause meant and how it had been interpreted.

In applying the case law and the applicable rules of construction to the contract before us we are of the opinion that the trial court properly decided, as a matter of law, that there was an implied in fact promise to supply Milton with his requirements for cars, subject only to certain special limitations set forth in the contract. ■■ In other words, we are of the opinion that the trial court properly decided that under this contract Hudson was bound in good faith to exercise its best efforts in making available to Milton his proportionate share of vehicles available.

In addition to the factors already discussed, a mere reading ·of the contract immediately suggests certain questions and also suggests the answers. Thus, if Hudson desired the undiluted power to refuse any and all orders, why did it not say so in clear and unambiguous language? It next occurs to us that if Hudson had inserted a clause to the effect that it reserved the unqualified power to refuse for any or no reason to fill any order submitted by Milton, is it reasonable to expect that Milton would have signed the contract? Why would he invest a large sum of money in a business that dealt solely and exclusively with Hudson automobiles and which required him to have Hudson automobiles to sell, if there was to be no obligation on the part of Hudson to sell him cars? It also occurs to us that if paragraph 2(a) were intended to relieve

Hudson of any liability to deliver any cars, then the clause is not only ambiguously drafted but illogically placed in the contract. Why would the parties put a general exculpatory clause in a portion of the contract dealing with "Sales and Shipment Conditions" when such a clause should logically appear in the general division of the contract entitled "Limitations, Laws, Definitions, etc.," and the specific subdivision thereof entitled "Limitations upon Distributor's Obligations"? But the most important fact is that we are not called upon to interpret paragraph 2(a) as if it were the only clause under interpretation. We are dealing here, and called upon to interpret, a lengthy and complex agreement. That agreement, as summarized above, is full of provisions necessarily recognizing some sort of an obligation on Hudson's part to supply Milton with cars. All of these provisions are incompatible with Hudson's theory of unqualified and unfettered discretion in the matter.

This holding that Hudson's interpretation is erroneous does not render paragraph 2(a) meaningless. As was said of a somewhat similar provision in *Dildine* v. *Ford Motor Co.*, 159 Mo.App. 410 [140 S.W. 627, 629] : "Evidently defendant, to guard against the contingency of being embarrassed by a flood of business on an unsettled market, sought to retain control of a situation which, but for some such stipulation, might become pregnant with loss and annoyance. But we think the stipulation was only intended to give defendant control over general conditions and contingencies, and was not intended for use as a weapon of fraud or of individual oppression."

The contention that Hudson's discretion was complete is not in accord with common sense or the facts of business life. Milton was expected to put a sizable investment into his selling organization. Milton had a compelling obligation to buy cars. If he did not buy them his franchise would be canceled and his investment lost. Under such circumstances why would the distributor desire to retain the privilege of withholding deliveries if the circumstances permitted the filling of orders? Milton's claim is that Hudson's actions were wholly unwarranted, that is, in bad faith. Hudson replies that its actions do not have to be justified. Would any businessman enter into such an arrangement if he understood its implications? Of course not.

Hudson asserts that practical necessity demanded that it reserve an unqualified discretion over the allocation of cars to dealers. This "practical" necessity existed in view of the then

car shortage and the wide variations in types, models, colors, accessories and transmissions then available to the public. Under such circumstances, says Hudson, unless it reserved the right to refuse to fill any order for any or no reason the courts and juries would be set up ''as ex post facto ration and allocation boards for the whole automotive industry.'' The force of this argument is dissipated in view of paragraph 43 of the agreement. It, and other paragraphs noted, affords complete protection from any embarrassment caused by the feared rush on the warehouses. Contrary to Hudson's contention that the uncontradicted evidence shows that Milton received his full and fair share of the available cars, there is evidence that when Hudson refused further cars to Milton, Hudson's warehouse was full of uncommitted cars, and other Hudson dealers were overstocked.

Thus, under the circumstances, we think the trial court's interpretation of the agreement was the proper one.

The next contention of Hudson is that the trial court committed error in interpreting the contract as a matter of law because there was extrinsic evidence offered that affected the interpretation, so that the construction of the agreement was one of fact and not of law.

It is, of course, now well settled that, when there is no extrinsic evidence, the construction of a written agreement becomes one of law, but, where extrinsic evidence is offered, the construction becomes a fact question for the jury.

The extrinsic evidence relied on is to be found in a conversation which occurred between Chapin, a special representative of the manufacturer of Hudson cars, and Milton prior to the execution of the contract. That conversation was testified to by Chapin as follows: ''Well, the first thing I told Mr. Milton, . . . was that we had agreed to sign him as a dealer under Hudson Sales Corporation, and then I explained to him that there would be absolutely no understanding or commitment as to the number of cars that we would provide him, that would be available to him. I explained to him that anything that he did as far as expansion of his facilities were concerned, he did on his own responsibility. I explained to him that we were going to sign him to a sales agreement, a standard sales agreement, and that we would live up exactly to the terms of that agreement, and we expected him to do likewise.'' Milton does not contend that this conversation did not occur, nor does he challenge the content of the conversation.

Did the introduction of this evidence convert the ques-

434

tion of interpretation from one of law into one of fact that should have been submitted to the jury? We think not. The oral testimony was in accord with paragraph 2(a) of the contract subsequently executed. It was uncontradicted. Of course, where the extrinsic evidence is conflicting it is necessary that the jury resolve the conflict. (*MacIntyre* v. *Angel*, 109 Cal. App.2d 425 [240 P.2d 1047].) While it may be that Chapin's statement gave rise to conflicting inferences, those inferences are precisely the same as arose from the writing itself. Under these circumstances the question remains one of law.

The last major contention of Hudson on this appeal is that the award of damages was erroneously based on hearsay and on speculative evidence. Before this point can be discussed certain principles of law should be set forth. As we have already held, Hudson contracted to supply Milton, subject to certain conditions not here involved, with his reasonable requirements for new cars. This obligation, in bad faith, it breached. The record shows that this breach substantially injured Milton. Now Hudson claims that Milton is not entitled to recover any damages because the proof of the amount of damages was not clear and certain. Of course, in the very nature of things, proving how many cars could have been sold had they been made available as provided in the contract, was most difficult, and could not be proved with absolute certainty. But this does not mean that the injured party is to be denied recovery for the breach of contract. This court several years ago had occasion to review the law on this subject in the case of *Allen* v. *Gardner*, 126 Cal.App.2d 335 [272 P.2d 99]. In that case, at page 340, we stated:

"Appellants have misconceived the law applicable to this situation. They stand before the court as violators of their contract. Their acts caused damage, serious damage, to Gardner. Those facts were proved definitely and with certainty. The law requires, and properly so, that the fact of damage be proved with reasonable certainty. (Civ. Code, § 3301.) Uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage, is fatal. But the same certainty as to the amount of the damage is not required. An innocent party damaged by the acts of a contract violator will not be denied recovery simply because precise proof of the amount of damage is not available. The law only requires that some reasonable basis of computation be used, and will allow damages so computed even if the result reached is only an approximation. (See annotation commenting on cases from many states, 78 A.L.R. 858.)

"These rules have frequently been applied in California. In *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 46 [172 P.2d 867], the California Supreme Court quoted the following with approval from *Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U.S. 251 [90 L.Ed 652, 60 S.Ct. 574] : ' "The most elementary conceptions of justice and public policy require that the wrong-doer shall bear the risk of the uncertainty which his own wrong has created. . . . That principle is an ancient one . . ." ' In *Stott* v. *Johnston,* 36 Cal.2d 864, 875 [229 P.2d 348, 28 A.L.R. 2d 580], it is stated : 'In this regard it appears to be the general rule that while a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment. . . .

" ' . . . the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision.' In *Long Beach Drug Co.* v. *United Drug Co.,* 13 Cal.2d 158, 174 [88 P.2d 698, 89 P.2d 386], the court declared : 'The fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent, or difficult of ascertainment does not bar the recovery.' In *Noble* v. *Tweedy,* 90 Cal.App.2d 738 [203 P.2d 778], these rules were again applied. There the court stated that once the fact of damage is shown with reasonable certainty 'the fact that the amount thereof may be difficult of exact admeasurement, or subject to various possible contingencies, does not bar a recovery.' (P. 745.) At page 746 the court declared : 'As long as there is available a satisfactory method for obtaining a reasonably proximate estimation of the damages, the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision. [Citing cases.] The method in the present case was practicable and fair, and the amount of damages assessed was as reasonably accurate as the circumstances would permit.' In *Hacker etc. Co.* v. *Chapman V. Mfg. Co.,* 17 Cal.App.2d 265, 271 [61 P.2d 944], the same rule is stated as follows : 'The fact that the exact amount of damage could not be determined does not defeat plaintiff's right to recover. . . . The law does not re-quire absolute certainty in fixing damages although it does require as much certainty as possible under the proof which is available. Oftentimes it is necessary that the amount be left to the discretion of the court or jury.' In *Pye* v. *Eagle*

*Lake Lbr. Co.*, 66 Cal.App. 584, 590 [227 P. 193], the court declared: 'This would leave plaintiff in a condition where defendants would admit the breach of their contract and say that because it was difficult for plaintiff to prove with exactness the amount of his admitted loss, that he could recover nothing. This, of course, is not the law. In cases where substantial damage is shown where the amount is entirely uncertain or extremely difficult of ascertainment the sum to be awarded is a question for the jury in the exercise of a sound discretion. The fact that the full extent of the damages must be a matter even of speculation is not ground for refusing all damages. (17 Corpus Juris 756.) ''While the actual amount of damages from the breach of a contract may not be susceptible of exact proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account . . .'' the law requires ''only that the best evidence be adduced of which the nature of the case is capable.'' (*Kennett* v. *Katz Const. Co.*, 273 Mo. 279 [202 S.W. 558].)' ''

█ In accordance with these rules the trial court properly instructed that: ''Where a party breaches a contract the law does not hold him faultless because of the difficulties that arise in proving the exact amount of detriment caused by him. Where the prospective profits are the natural and direct consequence of the breach of the contract, they may be recovered, and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced of devising a perfect measure of damages.''

Tested by these standards the evidence produced by Milton was legally sufficient.

█ Hudson points out that the verdict was for $35,750 and that the evidence shows that Milton made a net profit during the contract period of $18,000, which means, of course, that the jury fixed plaintiff's total profits during the contract period, had the contract not been breached, at $53,750, and contends that such figure is preposterous.

Before setting forth the evidence that supports that allowance, some other evidence should be referred to. Milton alleged that during the contract period he needed 300 new cars. If this allegation is supported, and it is, if the profit were spread over the full 300 cars it would mean a net profit of $179 per car. Actually, during the contract period Milton received 113 cars from Hudson, bought 10 from other dealers, sold six to other dealers, and used four as demonstrators. Thus, Milton actually had 113 cars for retail sale during the contract period.

Using 300 as the number of cars that Milton could have sold had the contract not been breached, this would mean that Hudson failed to deliver 187 cars. If the $35,750 verdict is spread over 187 cars, the average profit would have been $191 per car. The evidence was that the gross profit to the dealer on Hudsons was between $500 to $800 per car. Obviously, the more cars sold the greater is the net profit per car, because the fixed costs of operation can then be spread over more cars.

Hudson asserts that no Hudson dealer ever made anything approaching the profit claimed by Milton, and refers to the financial statement of one Grenfell. Grenfell was referred to by the trial judge as the "outstanding failure" in the area. Milton's financial statements were in evidence. The record shows that Hudson had in its possession monthly financial statements from every Hudson dealer in the area, but only introduced Grenfell's.

Hudson argues that the record shows that Milton got all the cars he wanted, and that he had on hand a 60-day supply of cars in every month. Actually the evidence shows that Milton was turning over his stock of cars every 30 days. If he had had more cars he could have sold them. Obviously it takes cars to sell cars, and the more selection one has of various models, the easier it is to sell them. The evidence shows that in spite of the limited number of cars available Milton maintained a better ratio of sales to inventory than other dealers in the area.

But, says Hudson, during the contract period, Hudson fixed a quota for each dealer, and the evidence shows that Milton received 90 per cent of this quota, the second highest percentage of quota of all the dealers in Alameda County. But the evidence supports the finding that Hudson deliberately fixed Milton's quota far too low. The quota was fixed at 128 cars. A Hudson dealer in the city of Alameda had a quota of 171. This Alameda dealer, prewar, had never sold over 12 cars a year, while Milton's former agency in Oakland sold 200 cars in 1940. The Alameda dealer had less facilities than did Milton, and was unable to sell all the cars allotted to him. The Berkeley dealer's quota was also 171. Prewar, he had never sold more than 78 cars, and only 54 in 1940. That dealer got all the cars he wanted but could sell only 82 cars in 1949. The Hayward dealer had a quota of 128, but could sell only 60 cars in 1949.

There was ample evidence that Milton, during the months

here involved, was crying for cars at times that Hudson's warehouse was bulging with cars, and at times that other dealers were getting more cars than they needed.

From this evidence the jury was entitled to infer that Milton's quota was designedly set too low by Hudson, and that Milton received far less than his fair share of cars. It is of some importance that Hudson failed to produce any evidence of the total number of cars delivered by the manufacturer to Hudson in this zone, although it did show the quota for this zone.

Milton's sales records and books of account for the years 1946, 1947, 1948 and the first nine months of 1949, were introduced into evidence. There is evidence that the period covered by this contract was a fine one for dealers—it was a seller's market. Hudson was one of the first automobile manufacturers to see the end of the postwar shortage of cars, and started to make quantity deliveries to dealers in the latter part of 1948. Hudson was able to advertise "immediate delivery" at a time when the public was still hungry for cars. The 1946-1948 records are not, therefore, true indices of what could have been sold in 1949.

Milton showed that from August, 1938, to April, 1941, the Hudson agency he then managed sold 404 new cars. His agency sold 200 new cars in 1940, which was a year when the total new Hudson registrations for the entire county was only 360. There were then five dealers in the county. During this period of 1938-1941, of the 404 Hudsons sold, 194 were sold to persons who had previously purchased Plymouth and DeSotos from Milton when he sold those cars—an indication that Milton was a good salesman. Hudson sales in 1948 and 1949 were materially higher than they had been prewar. In 1948, 521 new Hudsons were registered in Alameda County, and in 1949, 917 were registered. Thus, the evidence that Milton could sell 200 new cars in 1940 out of a total of 360, supports the inference that in 1949 he could have sold at least 300 out of a total of 917.

As already pointed out, Milton, during the contract period, was "crying" for cars, and, according to Hudson's district manager, making a "nuisance" of himself in his efforts to get more cars. He told Hudson that he wanted all the cars he could get, and offered to take the slow moving models. During months that Milton needed 30 or more cars, Hudson's agents were telling him that it was no use to order over 10 or 12. There was also evidence that Milton, during this period, had

an excellent sales staff, and his banker testified that Milton could have financed 300 cars a year.

This evidence, under the rules quoted above, is sufficient to support the award.

Hudson claims that some evidence on this issue was erroneously admitted. Milton, over objection, was permitted to testify as to how many persons, on an average per month, came into his agency and asked for cars that he was unable to deliver. Hudson objects that such testimony was hearsay and should not have been admitted, because the question before the court was how many of these prospects would have bought cars, and Hudson had no opportunity to cross-examine the prospects on this issue. Milton contends that the evidence was admissible under the so-called "state of mind" exception to the hearsay rule.

While declarations of design, intention or purpose, are sometimes admissible as an exception to the hearsay rule, such exception exists only where such declarations possess a high degree of trustworthiness on the issue involved. (McCormick on Evidence, p. 567, § 268.) There is little to insure trustworthiness in the fact that persons came into the agency and asked about cars. (See, generally, *People* v. *Alcalde*, 24 Cal.2d 177 [148 P.2d 627].)

But, as already pointed out, there was ample evidence, independent of this hearsay, to support the finding on damages. The erroneously admitted testimony was merely cumulative. Its admission could not have been prejudicial.

Hudson also contends that the trial court erroneously refused two instructions proffered by it on the requirement of certainty in fixing damages. As already pointed out, the court properly instructed on this issue. Moreover, the proffered instructions show, by their very language, that they were directed to the cause of action based on the Cartwright Act and not on the contract cause of action. The instructions were properly refused.

For the foregoing reasons the judgment on the contract action should be affirmed.

### The Restraint of Trade Action

In this cause of action Milton alleged, in substance, that, because of his successful operation and ability to attract customers who might otherwise buy from competing Hudson dealers, certain of such dealers and Hudson desired and planned to eliminate him as a dealer; that pursuant to such

plan, Lawson, Hudson's zone manager, and defendant Anderson, another Hudson dealer, agreed that, in return for Anderson improving his selling facilities, Lawson would cause Hudson not to renew Milton's franchise; that defendant Reath was made a party to the agreement; that in exchange for the participation of Reath and Lawson they were both to receive a financial interest in the Anderson Company, a corporation subsequently to be formed; that defendants Young and Van-Derzee became parties to this agreement to eliminate Milton as a competitor; that Lawson furthered the object of the agreement by refusing to sell Milton his needs and requirements for automobiles; that Milton's franchise was not renewed because of the efforts of defendants. It may be assumed that the facts amply support these allegations.

The question is whether such allegations and proof state or prove a cause of action under the Cartwright Act. We think not.

The parties agree that the relevant provisions of the Cartwright Act are sections 16720, 16726 and 16750 of the Business and Professions Code. Section 16720 reads, in part:

"A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:

"(a) To create or carry out restrictions in trade or commerce. . . .

"(c) To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity."

Section 16726 provides: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

Section 16750 permits, in a civil action under the act, the recovery of double the damage sustained by any "person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter."

There have been relatively few California cases construing the Cartwright Act. As a result the parties quite properly refer principally to the federal law. There is little doubt that cases decided under the Sherman Act and the common law policy against restraint of trade are applicable to problems arising under the Cartwright Act. (*People* v. *Building Maintenance etc. Assn.*, 41 Cal.2d 719 [264 P.2d 31] ; *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 [172 P.2d 867].) But the same does not apply to all of the cases decided under the Clayton Act. As was pointed out by Mr. Justice Dooling in *Rolley, Inc.* v. *Merle Norman Cosmetics,*

*Inc.*, 129 Cal.App.2d 844, 851 [278 P.2d 63, 282 P.2d 991], the Clayton Act is broader in its prohibitions than the Sherman Act, and, in the same respects, is broader than the Cartwright Act, so "that cases based on the Clayton Act are inapplicable here."

Before discussing the case law applicable to the problem presented some mention should be made about the order in which the various appeals here involved will be considered by this court. As already pointed out, the jury returned a $50,000 verdict (doubled, $100,000) against Hudson, Young, VanDerzee and Lawson. These four have appealed from the judgment entered on that verdict. Subsequently, the trial court granted a new trial to these four defendants on this cause of action. On their appeal from the judgment it is the contention of Hudson, et al., that they are entitled to a directed judgment in their favor because there is no proof of public injury, as distinguished from injury to Milton individually, and that such is required by the Cartwright Act.

██ Of course, normally where there are such double appeals the appeal from the order granting the new trial is first considered, and, if affirmed, the appeal from the judgment is dismissed. (3 Witkin, California Procedure, p. 2299.) But such procedure indicates that a new trial should be had. If, as Hudson, et al., contend, the allegations and proof, as a matter of law, are legally insufficient to state or prove a cause of action, it would be futile to permit a new trial. In that event, judgment should be entered for Hudson, et al. For that reason, since we have concluded that Milton has not alleged or proved a case under the Cartwright Act, we will first consider the appeal from the judgment by Hudson, et al.

There is no doubt, under the allegations and proof, that Hudson, et al., agreed to eliminate Milton as a dealer with the intent to do away with his competition in the Alameda County area. ██ But the mere fact that Hudson, et al., placed some literal restraint on competition among East Bay dealers in Hudson automobiles by their agreement, does not, as claimed by Milton, *per se*, establish a breach of the Cartwright Act. This is so, because nearly every business contract eliminates competition in the sense that it prevents other parties from coming into the transaction. ██ It has been recognized for many years that antitrust laws are concerned only with unreasonable restraints. In *Chicago Board of Trade* v. *United States*, 246 U.S. 231, 238 [38 S.Ct. 242, 62 L.Ed. 683], the Supreme Court pointed out: "Every agreement concern-

ing trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.''

In *Lawson* v. *Woodmere, Inc.*, 217 F.2d 148, p. 151, it was said: ''In the classic cases of *Standard Oil Co. of New Jersey,* v. *United States,* [221 U.S. 1 (31 S.Ct. 502, 55 L.Ed 619)] . . . and *United States* v. *American Tobacco Co.,* [221 U.S. 106 (31 S.Ct. 632, 55 L.Ed. 663)] . . . the Supreme Court established the celebrated 'rule of reason' by holding that not all restraints of interstate commerce are within the ambit of the Sherman Anti-Trust Act, but only those restraints which are undue or unreasonable. The Act does not cover restraints that are merely incidental, casual and immaterial.''

The California Supreme Court has written (*People* v. *Building Maintenance etc. Assn.,* 41 Cal.2d 719, 727 [264 P.2d 31]: ''[I]t may be assumed that the broad prohibitions of the Cartwright Act are subject to an implied exception similar to the one that validates reasonable restraints of trade under the federal Sherman Antitrust Act. [Citing the Standard Oil Co. case.]''

Thus, the real question involved is whether the nonrenewal of a dealer's contract under the circumstances here involved constituted an unreasonable restraint of trade. Milton, of course, contends that it did. In support he cites and discusses many cases, several decided under the Clayton Act. Hudson, et al., also cite many cases and arrive at the contrary conclusion. It is not necessary to discuss these cases because we think two recent federal cases are decisive of the controversy.

The first of these is *Schwing Motor Co.* v. *Hudson Sales Corp.,* 138 F.Supp. 899; affirmed and District Court opinion adopted as opinion of the Court of Appeals—239 F.2d 176. There, the respective courts decided on the pleadings that the plaintiff had failed to allege any cause of action under either the Sherman or Clayton Acts. The case there alleged was much stronger than the one here involved, in that as a result of the claimed illegal agreement between Hudson and another dealer only one Hudson dealer would have been left in the city of Baltimore. In the instant case there were many Hudson dealers left in Alameda County.

In the Schwing case the court stated the problem as follows (138 F.Supp. at p. 900): ''The principal question . . . is

whether an agreement between an automobile manufacturer and a retail dealer, pursuant to which the manufacturer refuses to renew expiring agreements with two other dealers, and gives the dealer a 'virtual monopoly' of the sale of one make of automobile in one city, is a combination or conspiracy to monopolize trade or commerce, . . . in violation of the Sherman Act and of the Clayton Act.'' The amended complaints charged a conspiracy between Hudson and another dealer almost identical to the one here charged, with the results that, as here, plaintiff's dealership of some six years' standing was cancelled.

██ The court, citing many cases, pointed out that every manufacturer has a natural and complete monopoly of his product sold under his brand name. He may decide to sell his product to the public through dealers, and, if he does so, he may exercise his own independent discretion as to the parties with whom he will deal. ''This is a common law right which the anti-trust laws have not destroyed.'' (P. 902.) ██ ''A refusal to deal becomes illegal only when it produces an unreasonable restraint of trade or a monopoly forbidden by the anti-trust laws.'' (P. 903.) ██ The court then pointed out that even an exclusive dealership is not *per se* invalid, particularly where the article to be sold is in direct competition with the products of other manufacturers. ██ The court laid down the governing principles in the following language (p. 903) : ''The main purpose of the anti-trust laws is to protect the public from monopolies and restraints of trade, and the individual right of action for treble damages is incidental and subordinate to that main purpose. [Citing cases.] Public injury alone justifies the threefold increase in damages. It is essential, therefore, that the complaint allege facts from which it can be determined that the conduct charged to be in violation of the anti-trust laws was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce. [Citing many cases.]''

The court then analyzed the allegations of the complaint— allegations quite similar, and, in some respects, stronger than those here involved. It is pointed out that there is no allegation that the alleged conspiracy caused a dearth of automobiles in general in the area or of Hudson automobiles in particular, nor is there an allegation that any member of the public who desired to do so was prevented from purchasing a Hudson by the agreement. Even if fewer Hudsons were sold because of the charged agreement, which was alleged in the Schwing case,

444

"it does not follow that the public was injured or that there was any such restraint of trade as is forbidden by the anti-trust laws." (P. 904.) The court referred to *Apex Hosiery Co.* v. *Leader,* 310 U.S. 469 [60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044], where it had been held that the public was not injured by the fact that because of the conspiracy 1,000 pairs of Apex stockings failed to move in interstate commerce, for the reason that the conspiracy did not affect the general market in hosiery and did not give the conspiring group the power to fix prices, restrict production or lessen quality with impunity. The general hosiery market remained in its normal competitive state "So, in the case at bar, the public was not injured by the alleged fact that 357 Hudson automobiles failed to move in interstate commerce, since the market in the general commodity, automobiles in all price ranges, remained in its normal competitive state. The Apex case emphasized market control as a prerequisite for violation of the Sherman Act. [Citing other cases.]" (P. 904.)

The court pointed out that neither Hudson nor the dealer with whom it conspired controlled the automobile market in Baltimore, Hudson selling, in the year in question, but about two per cent of all automobiles sold in the United States. It quoted from several cases holding that, without a restraint producing an effect upon the market in a commodity generally, there is no illegal restraint, and that a restraint which merely affects a relatively minor part of the highly competitive market of the general commodity is not illegal. The court held that the complaint was fatally defective because no "horizontal conspiracy between competitors, no effort to extend the manufacturer's natural monopoly of its own product, no effort to establish market dominance and drive out the products of competitors, is alleged. . . . The question, of course, is what agreements tend 'unreasonably' to restrain interstate commerce, and whether the 'monopoly' is a true monopoly of a commodity, or merely the natural and proper monopoly which every manufacturer has of his own product in a highly competitive market." (Pp. 905-906.)

▇▇▇ The court then stated that the right of a manufacturer to his "natural" monopoly "is not to be lost simply because the manufacturer and the dealers discuss the matter before the expiring agency or dealership agreements terminate and are not renewed. . . .

"If the plaintiffs' contention were correct, it is hard to see how Hudson could ever reduce the number of its dealers in

any given area after discussing the matter with the dealers involved, since the remaining dealers, whether one or two or three, would have a 'virtual monopoly' of the sale of new Hudson automobiles in the area." (P. 907.)

The court concluded "that the amended complaints do not show any unreasonable restraint of interstate commerce nor any monopoly forbidden by the anti-trust laws nor any injury to the public sufficient to support an action for treble damages." (P. 907.)

On appeal to the Court of Appeals the decision of the District Court was "adopted as the opinion of this court" for the reason that "we agree . . . that no violation of the Sherman or Clayton Acts . . . is alleged for reasons adequately stated in . . . [the] opinion." (*Schwing Motor Co.* v. *Hudson Sales Corp.*, 239 F.2d 176.)

The Schwing case is on all fours with the instant one. Except for changes of names, the opinion, in most respects, could be adopted *in toto* as the opinion on this phase of the instant case. If it states good law, and we think that it does, it is decisive of the present appeal.

In his briefs on this appeal Milton placed his greatest reliance on the case of *Webster Motor Car Co.* v. *Packard Motor Car Co.*, 135 F.Supp. 4. That case, too, is on all fours with the instant one, and undoubtedly the District Court decision relied upon supports the position taken by Milton. The Webster case was discussed in the Schwing case, and the Court of Appeals refused to follow it, holding it to have been erroneously decided. The Webster case was appealed. After the briefs were written in the instant case, the Court of Appeals for the District of Columbia Circuit reversed the District Court. (*Packard Motor Car Co.* v. *Webster Motor Car Co.*, 243 F.2d 418—decided April 18, 1957.) Certiorari has been filed with the United States Supreme Court but has not yet been acted upon.

In the Webster case the action was based on alleged conspiracy between the Packard manufacturer and the plaintiff's rival car dealer to eliminate plaintiff as a Packard dealer and to install the rival dealer as the exclusive Packard seller in the Baltimore area. The case was submitted to the jury and a large verdict returned. This the Court of Appeals reversed, holding that, as a matter of law, no cause of action had been stated.

The Court of Appeals held that "[w]e think the defendants were entitled to judgment. We agree substantially with *Schwing Motor Co.* v. *Hudson Sales Co.* . . ." (P. 420.)

The court held that, under the facts alleged and proved, there was no monopoly or conspiracy to monopolize within the meaning of the Sherman Act. The court referred to and quoted from the so-called "cellophane" case decided by the Supreme Court of the United States after the Webster case had been decided by the District Court—*United States* v. *E. I. du Pont de Nemours & Co.*, 351 U.S. 377 [76 S.Ct. 994, 100 L.Ed. 1264]. There the court had held that an agreement tending to create a monopoly had to be appraised in the terms of a competitive market for the product, and that where commodities are reasonably interchangeable by consumers for the same purposes, agreements restraining trade as to a portion of the general product are not illegal. Thus, although Du Pont produced 75 per cent of all cellophane in the country, there was no illegal monopoly. The Court of Appeals in the Webster case then held: "Since there are other cars 'reasonably interchangeable by consumers for the same purposes' as Packard cars and therefore in competition with Packards, an exclusive contract for marketing Packards does not create a monopoly. And there is no evidence of any attempt or conspiracy to create a monopoly, since there is no evidence of any attempt to get control of the relevant market." (P. 420.)

The court went on to hold that there was no illegal contract or conspiracy in restraint of trade, because only "unreasonable" restraints are prohibited. The court then held that if competition in the general product at both buyer and seller levels still exists, the challenged agreement that results in an exclusive dealership is not illegal. The court stated (p. 421):

"The short of it is that a relatively small manufacturer, competing with large manufacturers, thought it advantageous to retain its largest dealer in Baltimore, and could not do so without agreeing to drop its other Baltimore dealers. To penalize the small manufacturer for competing in this way not only fails to promote the policy of the anti-trust laws but defeats it.

". . . That Packard had agreed with Zell [the competing dealer with whom Packard was alleged to have conspired] not to renew Webster's contract . . . is immaterial, not only because the agreement was legal, but also because it inflicted no damage."

One judge dissented in the Webster case. This judge not only agreed with the District Court in the case, but expressly refused to follow the Schwing case, holding that any restraint, a product of an agreement to restrain, is unreasonable and illegal. This conclusion is contrary to the decided cases.

Further discussion is unnecessary. These two cases are on all fours, and controlling. The judgment against Hudson, et al., must be reversed and the trial court directed to enter judgment in their favor. This disposition of this appeal necessarily disposes of all the other appeals.

It is therefore ordered:

1. The judgment on the first cause of action from which Hudson Sales Corporation appeals is affirmed;

2. The judgment against Hudson Sales Corporation, W. E. Young, N. K. VanDerzee and Frank J. Lawson on the second cause of action under the Cartwright Act is reversed, and the trial court directed to enter its judgment in their favor.

3. The order involved on the appeal by John M. Milton from the order granting the new trial on the second cause of action is modified to provide that judgment should be entered for all the defendants, and, as so modified, is affirmed. Respondents to recover costs on this appeal.

4. The judgment entered in favor of Donald C. Reath on the second cause of action is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied August 14, 1957, and the petition of defendant and appellant Hudson Sales Corporation for a hearing by the Supreme Court was denied September 11, 1957.