[Civ. No. 38883. First Dist., Div. Two. Oct. 30, 1978.]

JAMES K. LISEC et al., Plaintiffs and Appellants, v.
UNITED AIR LINES, INC., Defendant and Appellant.

970

## COUNSEL

Lewis, Rouda & Lewis, Marvin E. Lewis, Michael B. Moore and Victoria J. De Goff for Plaintiffs and Appellants.

Robert E. Cartwright, Michael B. Moore, Glenn T. Bayshore, Leroy Hersh, Robert G. Beloud, William P. Camusi, David D. Baum, Edward I. Pollock, Stephen I. Zetterberg, Arne Werchick, Ralph Drayton, Richard D. Bridgman and Leonard Sacks as Amici Curiae on behalf of Plaintiffs and Appellants.

Sedgwick, Detert, Moran & Arnold, John B. Marchant, Arnold T. Aikens, Michael A. Katz, Robert S. Rankin, Jr., and Philip J. Hogan for Defendant and Appellant.

## OPINION

**McBRIDE, J.**[*]—This appeal is from an order of the trial court granting a motion by respondent for a new trial[1] after denial of its motion for judgment notwithstanding the verdict. The verdict, on the 51st day of trial, awarded appellants $368,049 compensatory and $1,476,194 punitive damages. A cross-appeal was filed, wherein respondent United Air Lines, Inc., (hereinafter United) asks that judgment of the trial court in favor of appellants be reversed and that this action be remanded with directions to dismiss the complaint. This contention should be examined first, for if sound, it will dispose of the case in its entirety,[2] inasmuch as United argues that there is a lack of substantial evidence to support any judgment.

The salient facts are these: Since 1936, United has maintained a "Suggestion Program"[3] which processes many Suggestions received from its employees, Suggestions made to improve operations and the financial condition of United. The company maintains rules for the Suggestion

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]The new trial motion was granted conditionally, the condition being that appellants were given 15 days in which to remit the punitive damages, which they declined to do.

[2]"Sometimes . . . it may be necessary to depart from the normal procedure and consider the cross-appeal from the judgment first; e.g., where the cross-appellant shows that the allegations and proof of the plaintiff are insufficient to establish liability. In such a case affirmance of the order granting a new trial will simply continue wasteful litigation, while reversal of the judgment will terminate it on the merits. (See *Milton* v. *Hudson Sales Corp.* (1957) 152 Cal.App.2d 418, 441.)" (6 Witkin, Cal. Procedure (2d ed. 1971) § 350, pp. 4324-4325.)

[3]The capitalized words "Suggestion," "Suggestion Program," and "Suggestion System" are used herein in connection with the United program as distinguished from the generic terms suggestion and/or system or program.

Program, which represent to its employees what procedures will be followed in handling their Suggestions and determining appropriate awards for those whose Suggestions are accepted.

The preface to the Suggestion System rules states that the purpose of the System is to contribute to United service, cost reduction and profit by fostering a climate in which the creative abilities of all employees will be developed and utilized; to provide an orderly, company-wide System, whereby ideas will be encouraged, submitted, investigated and answered. A Suggestion is a specific proposal, intended to benefit United, submitted on a Suggestion Form provided by the company. The Suggestion Plan regulations provide that certain Suggestions are not eligible for awards, including "F. Ideas which duplicate previous active Suggestions. G. If there is acceptable evidence in writing that the idea was initiated before the receipt of the suggestion." The minimum award which is made is $5; the maximum is unlimited. "The decision of the Judges[4] concerning awards is final." Regular awards,[5] if benefits are computable, are based on 10 percent of the estimated first or a typical year's net savings, whichever is greater. Impetus Awards may be recommended if the resolving office (the department which will benefit principally from the Suggestion) wishes to recognize the contribution of a Suggestion which speeds up ongoing action or a project initiated before the receipt of the Suggestion. The amount of an Impetus Award is indefinite, but the rules provide that an attempt should be made to estimate the value of earlier implementation.

The Suggestion made by appellants pursuant to the rules was in three parts, identified briefly as follows: (1) "In view of our current need to increase revenue, and to fill every available seat, I suggest that we institute an interline space available, 80% discount travel program, somewhat on the lines of what Pan American World Airways instituted recently during their own acute revenue shortage period . . . (2) [O]ur agreements with other airlines for discount travel are based on reciprocity. . . . I suggest we change our approach to one of maximizing profits for United by offering discounts to employees of supplemental carriers, local SVC [regional] carriers like PSA etc. (not to be based on reciprocity) . . . (3) In order to increase revenue, I suggest we offer unlimited reduced fare privileges to parents of United employees."

[4]Judges are "section level manager or above who are appointed by the President of United for 15 month terms."

[5]Regular awards are those given for Suggestions accepted by the company, excepting therefrom Suggestions accepted which merit only an Impetus Award.

The Suggestion made by appellants was admittedly not novel (nor was it required to be).[6] Appellant Lisec said, "Our excess capacity and very low load factors are an open secret," and recommended, "Every extra dollar earned on a flight will reduce our operating deficit. Some other operators have already set the precedent to their own benefit. Pan Am and TWA are two examples."

The evidence clearly shows that United had already received many Suggestions from its employees on Suggestion Forms, and by letters from others, suggesting substantially the same reduced fare liberalization urged by appellants. United had responded to them, stating then current company policy for not accepting them.[7] In general, their replies noted company concern that loading United airplanes with their own employees and kin and employees of other lines might impair company service to full fare passengers. Management apprehended that greatly reduced rate allowance to employees of all other lines might have to be cancelled if conditions should change materially, with possible resulting loss of good will, and stressed a belief that evolution rather than revolution in reduced fare policy was sound management. United's management received many Suggestions from within and without the corporate family, and considered and reconsidered them, as will be noted.

United began entering reduced rate agreements with international carriers in the 1950's reaching 32 such agreements by 1960 and 67 by 1970. These agreements provided that employees of the international carriers and their families could fly at reduced fare of 50 percent off, space reserved, one time per year.

In 1964 and 1966, the company began to offer to regional or local service carriers unlimited reduced (50 percent) fares for positive space, pleasure and business related, travel and an annual free pass for space

---

[6]Regular Suggestion status is accorded by the rules to any idea or program which the company has considered earlier and abandoned, or which the company has failed to act upon. Appellants seem to contend that the company must, if it will eventually accept, do so by proceeding toward implementation without interruption.

[7]Fifteen Suggestions, received over the period from January 1, 1970, to June 2, 1971, all related to reduced fares. Three of these were received before appellants' Suggestion and urged expansion of benefits for United employees. A Suggestion Program employee testified they were all duplicates of earlier Suggestions. United introduced 18 replies made to Suggestions, most of which were made prior to appellants' Suggestion, and in a majority of the replies (many of which were identical) there was a statement that United had received many proposals to liberalize "benefits for our employees and those of other carriers." Several of the replies mention that these policies are constantly under study.

available pleasure travel. Prior to appellants' Suggestion, United non-management employees had unlimited 50 percent positive space discounts and management employees had 75 percent positive space discounts. No discounts or free passes were offered to trunk carriers, such as TWA and American Airlines (i.e., domestic, long haul carriers).

In 1967, J. Leslie Ehringer, United's manager of Interline Sales, recommended that United enter into 50 percent reduced rate business travel arrangements with all trunk and some supplemental carriers; that it defer entering pleasure travel agreements with trunk carriers at that time, to be reconsidered in one year. The company accepted the recommendation, because it first wanted to evaluate the effects of business travel expansion. In April 1969, Ehringer was authorized to enter negotiations for reciprocal business travel agreements with the trunk and supplemental carriers.

In June of 1969, aware of similar discount fares adopted by TWA and Pan Am, Ehringer suggested a 75 percent discount for space available pleasure travel by employees of international carriers, a proposal made in response to inquiries from United's own employees and from other airlines seeking such reduced fare agreements.

In 1970, under the direction of corporate secretary Dimfle, Ehringer reviewed pleasure travel policies of other trunk carriers. The result was a report February 2, 1971, showing each trunk airline's pleasure pass policy. Ehringer noted that in the four years then immediately past he had proposed a 75 percent reduced rate, space available agreement with the carriers, but that it had not been approved.

Appellants' first Suggestion was in March 1971, after the foregoing activity by Ehringer. In December 1970, United Airlines merged with Western International Hotels Corporation and both became subsidiaries of UAL, Inc. At that time, Ed Carlson, former chief executive of Western International Hotels, became President of both UAL, Inc. and United Airlines. As a result of that management change, Mr. Ehringer was told in February 1971 that he should concentrate on revenue from full fare passengers and delay work on reduced fares.

Though Ehringer's priorities changed, he still was involved in the area of reduced fares. As part of his job he drafted responses for Mr. Carlson to letters sent on the subject. One letter, sent May 14, 1971, was from Ray North, an employee at Dulles Airport, relaying incidents where employ-

ees of other airlines were criticizing United for not giving passes and were suggesting that they try to avoid booking seats for United. Ehringer's response (signed by Carlson) mentioned a review three years earlier and also stated: "Our interline department has been researching this matter recently, and another review will be taken on this subject soon." A similar response was sent September 21, 1971 to Oscar Otto, a Pan Am employee asking about United's lack of pass privileges for trunk airlines.

In a report written September 30, 1971, discussing a London meeting of interline sales managers, Ehringer wrote that it was his intention to "submit a complete plan to revamp [United's] pleasure pass reduced rate policy before the end of the year." At an interline meeting in Australia in October 1971, Ehringer was approached by representatives of several airlines who asked about pass policies. He told them he was working on the question and would take action when he got back. When he returned he met with his superior, Mr. Hartigan, who gave him the go-ahead to finalize a reduced travel study for his review. A few days later Hartigan told Ehringer the front office was interested in the project.

On November 4, 1971, around the time of this conversation between Hartigan and Ehringer, Carlson received a letter from a hotel business friend from Galveston, Texas, Eugene Lucas. In the letter, Lucas told Carlson of two incidents where he had discovered that employees of other airlines were not booking for United because of their failure to give travel benefits to these employees. Mr. Carlson wrote back, thanking Lucas and stating that United would continue to monitor the situation. On November 11, 1971, Mr. Carlson sent a letter to the secretary and three members of the Corporate Policy Committee (CPC) attaching the Lucas letter and suggesting it be a discussion item on the CPC agenda.

The Lucas letter was discussed at the November 22, 1971, meeting of the CPC and a study was ordered. On November 23, 1971, Mr. Ehringer was asked to conduct a study dealing with present interline pass policies of United and its competitors. On December 20, 1971, Ehringer completed his study, recommending revision of pleasure reduced rate agreements to include 75 percent space available and 50 percent positive space travel and to apply to international, local service, and trunk carriers. In early January, Ehringer was informed by Hartigan that the CPC had approved his recommendations and that he should proceed to negotiate contracts with the various carriers, which he did.

As a result of the policy changes affecting employees of other airlines, United expanded the benefits for its own employees and their parents to give them the same benefits.

The evidence of Ehringer's activities in the area of reduced fares intra-airlines is uncontradicted. Appellants argue that management's rejection of Ehringer's proposals shows no management action on the subject. However, study, review and rejection are just as much management "actions" as is implementation. The evidence showed continuous study and review, but that management was of the belief that the time was not right for such drastic expansion of reduced fare travel. The conclusion is inescapable that appellants did not provide new or different ideas nor ones earlier abandoned by United, but merely provided impetus by their constant prodding and their presentation of the ideas directly to the new president of the company.

Webster's Third New International Dictionary (1970) page 2286, lists synonyms for "suggestion" as "imply, hint, intimate, insinuate." "It's only a suggestion" is not an uncommon idiom. Suggestion, therefore, implies a passive approach to the person or entity receiving the suggestion, as contrasted with an aggressive, overpowering campaign, calculated to force the acceptance of the Suggestion and to require its implementation. Appellants did not understand, or want to understand, the Suggestion System to be a passive procedure. Appellant Jagga explained that he took Lisec as a partner in this Suggestion venture because he knew him to be a "very perseverant and persistent individual."[8] Appellants launched their campaign by offering the tripartite Suggestion that the company change its policy with regard to reduced rate travel. They explained in court that they offered their Suggestion in three separate presentations, knowing that in so doing their idea would reach and be considered by more United management people. Later, when this purpose had been served, the three parts were consolidated and the idea was treated both by them

[8] The appellants were at all times pertinent hereto and are now "management employees" of respondent. Lisec testified that one in ten of respondent's employees is so classified. He holds a B.S. degree in personnel management and has had 18 months of law school training. Jagga has a B.S. degree in aeronautical engineering and an M.A. in business administration. Lisec explained that United has nonmanagement employees who are usually hourly paid; professional and technical people, just below management employees; "and then the management employees which is the group that I am part of which involves the normal management of the company to control, organize, et cetera . . . Suggestion Program has its headquarters in Chicago, but part of my function as a personnel representative involved trying to sell the Suggestion Program, inducing or help [sic] employees to use this as a means of helping United Airlines."

and the company as one Suggestion, and an Impetus Award of $1,000 was given to appellants.

While they campaigned for their idea, appellants presented the first segment twice and received a rejection; presented the second segment or supplements thereto eleven times and received six rejections; presented the third segment or supplements thereto seven times and received five rejections. This activity was concentrated in the months March 1971 through July of 1972. There were many, many communications by letter between appellants and members of higher management. The exhibit upon which all of this activity is noted in small print for the benefit of the trial jury is a sheet of paper more than thirteen feet long and three feet wide. It bears the caption "THE 'BIG SWITCH' IN PHILOSOPHY AT UNITED (Subject: Airline Employee Discount Travel Market) HOW AND WHY IT HAPPENED." Appellants' admitted purpose was to cause management to change its philosophy about reduced fares for employees and their kin, both of United and other airlines, from one of concern for benefits for United's employees to one of concern for revenue to be derived from filling empty seats in the airplanes. In essence, their activity constituted a calculated, vigorously pursued effort in this one selected area. They moved in to argue policy with management in a perseverant and persistent manner. As we have noted, what they proposed was well known to United.

It is apparent that appellants' perseverance and persistence, particularly in getting their idea before Mr. Carlson, provided impetus to United's change in reduced fare policies. However, it does not follow that the $1,000 Impetus Award given was inadequate.

The Impetus Award concept does not even appear in the Suggestion Program brochure. Its only mention in the seven pages of regulations 15-10 is in one paragraph, providing in full: "Impetus Awards *may be* recommended if the resolving office *wishes* to recognize the contribution of a Suggestion which speeds up an action or a project initiated before the receipt of the Suggestion. An attempt *should* be made to estimate the value of earlier implementation." (Italics added.) In the Suggestion Evaluation Manual, furnished to Suggestion Plan employees, the following explanation of an Impetus Award is given: "Impetus toward a solution to a problem implies that there is documentation of prior knowledge of the problem and prior decision on the method of solution. Justification for such awards may be provided by the Resolving Department. It may consist of hastening benefits by refocusing attention on the

matter or by offering helpful information toward a solution which is already in progress. Such awards will be based upon the degree of help provided toward the overall solution, and the savings generated through earlier implementation. When it is possible to isolate the specific benefit rendered, it will be evaluated independently."

■ It is evident from the foregoing, that the granting of an Impetus Award is within the discretion of the company. It "may" grant such an award if it "wishes" to recognize a contribution. Unlike the situation with the regular award provisions, an employee reading about the Impetus Award could not reasonably conclude that if he submitted a suggestion giving impetus to the company he would be *entitled to* an award. Thus by his submission he seeks only to obtain a gratuity. He does not seek to create a binding contract. If the company declines to recognize his suggestion with an award, he may be disappointed, but cannot legitimately complain that a promise has been broken.

Quite similar factually in the Impetus Award feature of this case is *Calkins* v. *Boeing Company* (1973) 8 Wn.App. 347 [506 P.2d 329]. The plaintiff therein was employed by Boeing. He was aware of the company policy soliciting suggestions from employees and knew that Boeing, from time to time, compensated employees who made suggestions useful to the business. He had read the rules, and knew they provided that the decision of the company was final and conclusive as to the amount of a cash award, if any, and the person or persons entitled thereto, and all other matters concerning the suggestion; that suggestions were required to be submitted on Boeing forms; that the language of the rules made it clear that even if used the award, if any, was to be the company's final decision. The company's suggestion system staff, after evaluating the suggestion made by Calkins, declined to compensate him on the grounds that the ideas were not original and were developed within his line of duty as an employee. The court said that there was no justification from the rules for a state of mind in the plaintiff whereby he would expect payment from the defendant unless the defendant in its discretion chose to make payment. Chance though it was, it was made available to him by the employer. It pointed out that the company reserved to its absolute discretion the utilization of employee suggestions and could do so with or without payment. The court concluded that under these facts neither contractual nor quasi-contractual recovery was proper. No legal agreement existed since any decision of the employer to pay was absolutely within the employer's discretion. Quasi-contractual recovery was improper because it was clear or should have been clear to the employee

that payment was up to the inclination of the employer. (See also *Milich v. Schenley Industries, Inc.* (1976) 54 App.Div.2d 659 [387 N.Y.S.2d 641]; *Parrish* v. *General Motors Corporation* (Fla.App. 1962) 137 So.2d 255; and *Mosow* v. *National Lock Company* (1970) 199 Ill.App.2d 232 [255 N.E.2d 500].)

In its new trial order, the court here concluded that United's granting of an Impetus Award somehow created an obligation upon it to take proper steps to determine the value of earlier implementation.[9] This position was apparently based upon that portion of the regulation which states that an attempt "should" be made to evaluate earlier implementation and a statement in the Suggestion Evaluation Manual that Impetus Awards "will" be based upon the degree of help and the savings generated. Thus, the argument is that even if an Impetus Award is discretionary, once it has been determined that one should be given, the employee is vested with a right to have the amount "properly" determined. The problem with this argument is that it presumes a contractual relationship where none exists. If there is no obligation upon United to pay for ideas providing impetus, its gratuitous decision to compensate an employee for presenting such an idea does not create a legal obligation of any kind. Rules regarding computation of Impetus Awards provide internal guidance for United, but do not bind it in its relationship with employees.

The jury was instructed that it could return a verdict for appellants if it found that United made a promise with the purpose of inducing appellants' reliance and that appellants, unaware of United's intention, acted in justifiable reliance to their detriment. It was instructed also that the measure of damages from such a tort would be based upon the benefit of the bargain.

---

[9]The court here rejected that part of an instruction proposed by United which would have stated that "the granting of an impetus award and determination of the amount thereof is within the discretion of the defendant and is binding upon plaintiff in the absence of fraud or gross mistake." The quoted portion was deleted and replaced by the statement: "If you find that the plaintiffs were entitled to an impetus award and the defendant mistakenly, fraudulently or in bad faith did not make an attempt to estimate the value of earlier implementation of the contribution of the plaintiffs' suggestion, or to attempt to isolate the specific benefit rendered and evaluate it independently, then you may award any amount up to and including 10% as an impetus award."

On the surface this modification may seem minor. But its effect was to allow the jury to find an "entitlement" to an Impetus Award where the program left such an award within the discretion of United. To the extent that the instruction may have allowed the jury to make its own determination of whether an Impetus Award was discretionary, the court abdicated its responsibility to interpret the contract documents.

Since appellants were not entitled to a regular award and the representations concerning the Impetus Award revealed its discretionary nature, no fraudulent inducement was proven as to either award program. Appellants may have been induced to submit their Suggestions by representations made concerning regular awards. However, there was no evidence that United did not fully comply with its obligations to consider appellants' Suggestions. United breached no promise to pay a regular award because appellants' Suggestions did not meet the requirements for such an award. If appellants were induced to submit their Suggestions by representations concerning the impetus program, their reliance was not reasonable. The most they could reasonably expect was that United might exercise its discretion in their favor, which it did. They had no reasonable expectation that United was bound to grant any award or that if one were given it would be in any particular amount or computed in any particular manner.

We, therefore, conclude that there was no substantial evidence supporting a finding that appellants qualified for a regular award or punitive damages and that there is no contractual basis for an Impetus Award. Thus, it is not necessary that we consider the adequacy of the trial court's specification of reasons for granting a new trial, nor the effect of its reception into evidence of *post* trial juror declarations at the hearing of the new trial motion.

The case is reversed with directions to the trial court to enter judgment in favor of United. All parties are to bear their own costs on appeal.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied November 29, 1978, and the petition of the plaintiffs and appellants for a hearing by the Supreme Court was denied January 17, 1979. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.