EXXON MOBIL CORPORATION,
Plaintiff,

v.

NEW WEST PETROLEUM L.P., New
West Petroleum, L.L.C., New West Pe-
troleum, New West Stations, Inc., and
New West L.L.C., Defendants,

and Related Third–Party Claims,
Crossclaims, and Counterclaims.

No. CIV. 03–2222 WBS EFB.

United States District Court,
E.D. California.

July 15, 2008.

Michael John Miguel, Morgan Lewis and Bockius LLP, Leemore L Libesman, Holme Roberts & Owen LLP, Los Angeles, CA, for Plaintiff.

Spencer T. Malysiak, Spencer T. Malysiak Law Corporation, Folsom, CA, for Defendants.

## MEMORANDUM OF DECISION

WILLIAM B. SHUBB, District Judge.

This action involves disputes over which party is contractually responsible under a Purchase and Sale Agreement ("Agreement") between plaintiff Exxon Mobil Corporation ("Exxon") and defendants New West Petroleum, New West Petroleum L.P., and New West Petroleum L.L.C. (collectively, "New West") for paying the costs of cleaning up petroleum contamination at 3430 Northgate Boulevard in Sacramento, California ("Property").

On October 3, 2007, a month-long jury trial concluded in mistrial when the jury was unable to reach a verdict. The parties subsequently waived their right to a second jury trial and stipulated to adjudication by the court based upon the existing record and post-trial briefing. The court has reviewed the parties post-trial briefing and heard two days of oral arguments. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I. *Background*

Exxon, the holder of a ground lease in the Property since December 1988, built and operated a retail gasoline service station on the Property beginning in 1991 that sold unleaded gasoline containing methyl tertiary butyl ether (MTBE). On July 6, 1998, Exxon entered into the Agreement, therein assenting to sell the service station to New West, whose own operation of the station would include the continued sale of unleaded gasoline with MTBE properties. Shortly thereafter, Exxon also assigned its lease interest in the Property to New West. On January 19, 2001, New West sold the station and assigned its interest in the lease to cross-plaintiff Sartaj Singh Bains.

Due to known releases of contaminants that occurred while Exxon operated the Property, the Agreement attempted to apportion the responsibility for required remediation efforts between Exxon and New West. (Trial Ex. at 37 ¶¶ 11–12.) As the Agreement required, Exxon began investigating the extent of the contamination in 1998 and subsequently implemented monitoring and remediation systems. During its remediation efforts, Exxon's tests revealed increasing levels of MTBE, which gave rise to the disputes in this case.

The remaining claims in this action are as follows. Exxon's Second Amended Complaint contains eight claims against New West: (1) breach of the purchase and sale agreement; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory relief setting out the rights and duties of the parties; (4) express indemnity; (5) equitable indemnity; (6) violations of California Business and Professions Code section 17200 ("section 17200"); (7) violations of section 17200 predicated on California Health and Safety Code section 25296.10 ("section 25296.10"); and (8) violations of section 17200 predicated on California Water Code section 13260(a).

New West, in turn, asserts counterclaims and crossclaims against Exxon and Bains, respectively: (1) against Exxon, breach of contract; (2) against Exxon, breach of the implied covenant of good faith and fair dealing; (3) against Exxon, express indemnification; (4) against Exxon and Bains, equitable indemnification; (5) against Exxon, declaratory relief for nonliability; and (6) against Exxon, violations of section 17200 predicated on violations of section 25296.10.

Finally, Bains asserts a single equitable indemnity counterclaim against New West and crossclaim against Exxon for equitable indemnity.

II. *Discussion*

To prevail on its claim that New West breached the Agreement and thus must reimburse Exxon for remediation expenses, Exxon has the burden of proving, by a preponderance of the evidence: (1) the existence and terms of the Agreement; (2) that Exxon performed its obligations under the Agreement or was excused from doing so; (3) that New West breached the Agreement by refusing to reimburse Exxon for its remediation of contamination on the Property that occurred after the date of the closing of escrow, September 18, 1998, (the "Closing Date"), (Trial Ex. 37 at ¶ 4), and that was not caused by Exxon; (4) that New West's breach caused the damages about which Exxon complains; and (5) the nature and extent of Exxon's damages. *Careau and Co. v. Sec. Pac. Bus. Credit, Inc.,* 222 Cal.App.3d 1371, 1388, 272 Cal.Rptr. 387 (1990); *Reichert v. Gen. Ins. Co. of Am.,* 68 Cal.2d 822, 830, 69 Cal.Rptr. 321, 442 P.2d 377 (1968); *see also Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.,* 520 F.Supp.2d 1184, 1194 (C.D.Cal.2007) ("Plaintiff has the bur-

den at trial of proving all elements of its breach of contract claim.").

## A. *Remediation Responsibility Under the Agreement*

■ In the Agreement, the parties attempted to delineate responsibility for any contamination existing on the Property at the Closing Date and any contamination occurring after that date. To do so, the Agreement provided that Exxon would undertake "remediation of the Baseline Condition" at the Property as required under applicable laws, regulations, or government orders. (Trial Ex. 37 at ¶ 12.)

The term "Baseline Condition" is ambiguous and confusing on its face. The Agreement defines the Baseline Condition in paragraph 11(b) as follows:

> [T] he level of petroleum hydrocarbon contamination (i) determined to be located on a Property prior to the Closing Date, (ii) caused by Exxon's operations on such Property, and (iii) required to be remediated under applicable federal, state or local laws and regulations, as such levels are established in the most recent written report setting forth the results of the Assessment or Additional Assessments for each Property, as applicable, as such levels may be reduced by Exxon's ... remediation activities.

(*Id.* at ¶ 11(b).) The court finds from a reading of the Agreement as a whole, and from the testimony, that the parties intended the word "level" in this definition to refer to the "amount" or "quantity" of contamination, rather than its situation, configuration, or density.

The court finds from the evidence that "the most recent written report setting forth the results of the Assessment or Additional Assessments for [the] Property" in the context of the above paragraph refers to the Initial Subsurface Investiga-

tion Report dated June 26, 1998 ("Delta Report").

The Agreement went on to provide that "Exxon will not be responsible for investigation or remediation of, or any cost related to, petroleum hydrocarbons or other contamination released or discharged on the [Property] after the Closing Date [ ]." (*Id.* at ¶ 12(d); *see also id.* at ¶ 12(e)(i) ("If Exxon causes the Additional Contamination as a result of its access to the Property, Exxon shall be responsible for the full cost of the cleanup of the Additional Contamination.").)

Thus, the court finds from the evidence that the parties contemplated that the costs of remediating the amount of contamination determined by the Delta Report to be located on the Property prior to the Closing Date would be borne ultimately by Exxon, but that the costs to remediate any contamination released or discharged thereafter, or not caused by Exxon's operations, would be borne ultimately by New West.

The starting point in resolving the parties' dispute, therefore, must be to determine what the Baseline Condition of the Property was. Paragraph 11(b) of the Agreement specifically required that the Delta Report, and any other written assessment reports, "delineate the amount and location of any petroleum hydrocarbons" that Exxon discovered as a result of the assessment. (*Id.* at ¶ 11(b).) The problem is that no matter how carefully the Delta Report is read, it is impossible to determine the amount of petroleum hydrocarbons that existed. The Delta Report indicated that MTBE "was reported in the soil samples collected from [a single monitoring well] at concentrations ranging from 280 mg/kg to 7,800 mg/kg" and that the "concentration" of MTBE in the ground-

water "was reported at 2,800" parts per billion.[1] (Trial Ex. 39 at 6.)

Because the parts per billion ratio used in the Delta Report reveals only the concentration of MTBE that existed in the test samples, it does not indicate the actual volume of MTBE that was in the soil or the mass of MTBE that was in the groundwater on the date of the tests. (Trial Trs. Sept. 14, 2007 39:12–22, Sept. 11, 2007 80:12–14.) A concentration measurement is also misleading in that it can change when there is an increase or decrease in the volume of groundwater at the test site even if the amount of MTBE remains the same. (Trial Tr. Sept. 7, 2007 146:10–18.) Consequently, the Delta Report's reliance on concentrations renders it impossible for the trier of fact to quantify the contamination that existed. (Trial Trs. Sept. 11, 2007 80:12–81:5, Sept. 18, 2007 55:5–13; see also Trial Trs. Sept. 7, 2007 118:8–119:9, Sept. 11, 2007 47:7–9 (indicating that, as of the date of trial, Exxon had yet to determine the extent of contamination at the Property).)

Not only does the data in the Delta Report fail to establish the "amount" of MTBE as of the Closing Date, the concentration measurements do not allow the court to make the calculations that the Agreement contemplates. Specifically, without the ability to identify the Baseline Condition, the court cannot quantify the amount of contamination Exxon caused prior to the Closing Date and, more importantly, the amount of contamination, if any, that was subsequently released on the Property.[2]

Even if the court could decipher a meaningful Baseline Condition from the Delta Report, the court is not persuaded that any purported Baseline Condition was not subsequently modified pursuant to paragraph 11(b). (See Trial Ex. 37 at ¶ 11(b) ("If further assessment or remediation of petroleum hydrocarbons is required by the Governmental Authority, the Baseline Condition of [the] Property shall be modified as appropriate based on the results of such additional assessments and remediation if caused by Exxon's operations.").) For example, on October 5, 2004, the Environmental Management Department for the County of Sacramento ("County") mandated that Exxon install at least two additional monitoring wells, (Trial Ex. 4), and one of Exxon's project managers for the Property testified that monitoring wells five, eight, nine, ten, and eleven were installed to comply with directives from the County. (Trial Tr. Sept. 14, 2007 16:25–17:4; see also Trial Tr. Sept. 18,

---

1. The Delta Report actually lists the concentration in terms of micrograms per liter (μg/L), which several witnesses testified is synonymous with parts per billion and milligrams per kilogram. (E.g., Trial Tr. Sept. 7, 2007 103:12–24, 144:17–21.) The court will refer to the ratio as parts per billion.

2. The court recognizes that New West had the opportunity, and was encouraged by Exxon to, perform its own testing and terminate the Agreement if the results were unsatisfactory. (Trial Ex. 37 at ¶¶ 7, 11(a), (c), (d).) With the Fourth Amendment to the Agreement, New West also had the opportunity to modify the Baseline Condition based on the results of its own tests. (Trial Ex. 42.) Nonetheless, New West's lack of diligence does not diminish the importance of determining the Baseline Condition. Exxon, the drafter of the Agreement, provided for the establishment of the Baseline Condition to limit its own liability and cannot rely on its failure to fulfill the obligation it reserved for itself. See San Bernardino Valley Water Dev. Co. v. San Bernardino Valley Mun. Water Dist., 236 Cal.App.2d 238, 265, 45 Cal. Rptr. 793 (1965) (" 'Each party to a contract has a duty to do what the contract presupposes he will do to accomplish its purpose.' Thus, 'A party who prevents fulfillment of a condition of his own obligation ... cannot rely on such condition to defeat his liability.' ") (citations omitted) (omission in original).

2007 57:3–10.) For reasons discussed in more detail below, Exxon has not proven, by a preponderance of the evidence, that it did not cause the contamination identified in the post-closing assessments.

### B. Breach of the Agreement and Damages

#### 1. Additional Contamination

■ While Exxon presented evidence of increased levels of MTBE detected at the Property, Exxon did not show by a preponderance of the evidence that these increases were not a result of the contamination Exxon had originally caused prior to the Closing Date; nor did Exxon show that the increases were caused by the operations of New West or Bains. After listening to all of the testimony and reviewing the trial exhibits, the court remains unpersuaded that additional contamination of the Property occurred after the Closing Date. This does not mean that the court finds additional contamination did not occur; it means only that Exxon has not met its burden of proof.

Exxon does not dispute that MTBE contamination occurred while it operated the Property, (Exxon's Opp'n to New West's Post–Trial Br. 13:8–10), and credible evidence was presented at trial that the Property's elevated levels of MTBE contamination were a residual result of Exxon's prior operations. For example, New West presented evidence that there was sufficient MTBE in the soil moisture in May 1998 to account for all of the MTBE reported through 2004. (Trial Tr. Sept. 26, 2007 40:21–42:14, 47:15–19.) New West also

presented evidence that the increased levels of MTBE reported after the transfer were from the build-up of MTBE concentrations from a release or releases during Exxon's operations and not from new post-closing releases. (Trial Tr. Sept. 25, 2007 117:24–121:20, 132:18–22.)

Exxon never investigated the source of the contamination at the Property. (Trial Tr. Sept. 7, 2007 138:16–139:19.) Exxon's expert, Brent Searcy, testified that it is difficult, if not impossible, to know what type of releases occurred at the Property. (Trial Tr. Sept. 18, 2007 73:24–74:24.) Searcy also stated that his computer modeling method was not designed to determine how the MTBE was released into the soil, as his modeling begins with the assumption that the mass of MTBE is already in the soil. (Trial Tr. Sept. 20, 2007 6:7–7:2.) Exxon's consultant responsible for remediating the Property, Ted Moise, also testified that Exxon rarely knows what caused contamination in the first place. (Trial Tr. Sept. 11, 2007 35:6–14.) This evidence alone makes it difficult to find that it is more likely than not that Exxon was not the cause of any additional contamination.

In an effort to show that either New West or Bains caused additional releases, Searcy testified that it was his opinion that there were three distinct instances of increased concentration of MTBE reported in the groundwater that resulted from post-closing unauthorized releases of petroleum. (Trial Tr. Sept. 14, 2007 135:22–136:18.) These "peaks" or "spikes" were detected on April 5, 2000, April 2, 2002,[3]

---

**3.** As to the second alleged "peak" in 2002, there was evidence that the increase in the MTBE concentration detected was due to a decrease in the volume of groundwater beneath the monitoring well. (Trial Tr. Sept. 7, 2007 151:5–152:16; Trial Ex. 233 at tbl. 2 (stating that a "[g]rab sample [was] collected due to insufficient water; well may have purged dry and not recovered").) Thus, a showing that MTBE concentration in the groundwater had increased is not tantamount to a showing of a new volume of MTBE entering the system from a new release, as the reduction of water volume may have lead to an increase in concentration. (Trial Tr. Sept. 7, 2007 145:15–146:18.)

and January 29, 2004. (Trial Tr. Sept. 14, 2007 124:13–129:4; Trial Ex. 1 at tbl. 2; Trial Ex. 232 at tbl. 2.)

Based on the spikes and his computer module tests, Searcy opined that it would have taken MTBE forty days to travel from the point of release to the groundwater where it was detected. (Trial Trs. Sept. 14, 2007 125:21–126:19, 147:9–15, Sept. 18, 2007 11:6–12:3, 84:12–20.) According to his tests, the vast majority of the MTBE would have moved through the soil to the groundwater within this time-frame, leaving only a relatively low fraction remaining in the soil. (Trial Tr. Sept. 18, 2007 12:4–13:4.) Exxon contends that these "spikes" preclude a finding that the contamination was caused by Exxon prior to the Closing Date. (Trial Tr. Sept. 14, 2007 135:22–136:12; Exxon's Post–Trial Br. 6:3–12, 19:19–20, 25:3–5.)

Weighing against Searcy's theory, however, is the fact that MTBE was no longer used in gasoline sold at the Property by October of 2003, (Trial Trs. Sept. 18, 2007 88:10–12, Sept. 25, 2007 55:16–56:3), and increased MTBE concentrations at the site showed up more than eight months after MTBE stopped being used at the station and again, in December 2004, approximately fifteen months after Bains stopped selling gasoline containing MTBE.[4] (Trial Ex. 233 at tbl.2; Trial Tr. Sept. 25, 2007 56:15–22.) Under Searcy's theory, any MTBE contamination should have migrat-

ed to the groundwater within forty days, thus, the detection of "spikes" of MTBE in December 2004 underscores the unreliability of Searcy's testimony.[5]

The concentrations of MTBE also continued to increase during the time that the station was closed while New West was installing new equipment. (Trial Tr. Sept. 20, 2007 125:1–134:4, Trial Ex. 233 at tbl. 2.) Just as Exxon has not explained how MTBE was still being detected long after Bains stopped selling fuel containing MTBE, Exxon has not explained how the concentrations of MTBE were increasing while the Property was closed during the installation of new equipment.

Credible evidence was also presented that both New West and Bains took measures to prevent and detect releases during their operation of the Property. For example, New West upgraded the equipment at the service station and installed new dispensers, new under-dispenser containment boxes, and new monitoring equipment. (Trial Exs. 210, 259; Trial Tr. Sept. 25, 2007 18:3–22:17.) All of New West's equipment tested tight and passed a Tracer Test, which is designed to detect leaks. (Trial Exs. 50, 78; Trial Trs. Sept. 20, 2007 142:19–145:16, Sept. 25, 2007 22:21–23:9, 25:3–10.) No releases were ever reported during New West's operation of the service station and no alarms ever sounded. (Trial Trs. Sept. 20, 2007

---

**4.** The December 2004 samples revealed MTBE contamination in the soil a few feet in depth, as well as ethanol contamination in the pea gravel. (Trial Ex. 81; Trial Tr. Sept. 25, 2007 56:4–22, 73:25–74:7; *see also* Trial Tr. Sept. 25, 2007 77:13–78:3 (Bains had the MTBE-contaminated soil excavated and disposed of offsite).) The presence of ethanol is not indicative of a release of MTBE because ethanol was used to replace MTBE. (Trial Tr. Sept. 11, 2007 133:7–18.) Exxon also did not establish that the presence of ethanol changed the remediation requirements for the Property or required Exxon to incur additional dam-

ages. (Trial Tr. Sept. 11, 2007 55:18–56:24, 164:1–10, 168:13–169:18; Bains' Opp'n to New West's Post–Trial Br. 17:3–5.)

**5.** Further, the "error rate" for the test used by Exxon in detecting the MTBE concentration is ten to twenty percent. (Trial Tr. Sept. 18, 2007 67:18–22, 68:9–73:5.) Given this error rate, the difference between the values that Exxon used to quantify each of the reported "spikes" of MTBE contamination could have been much smaller than what Exxon claims.

138:20–140:25, Sept. 21, 2007 32:5–10.) Even Searcy admitted that the magnitude of a release necessary to result in the increased MTBE levels detected would have triggered the monitoring systems' alarms. (Trial Tr. Sept. 20, 2007 9:10–15.) Bains also had a system in place designed to detect a release, (Trial Tr. Sept. 25, 2007 68:13–24), and he kept track of gasoline quantities on a daily basis to ensure that the amount in the tanks matched the amount that had been dispensed to customers. (Trial Tr. Sept. 25, 2007 72:16–73:2.) Like New West, Bains installed new equipment intended to increase the reliability of leak prevention and there were no reported releases during his operation of the Property. (Trial Tr. Sept. 25, 2007 63:7–20, 71:21–72:6.)

As the parties agree, determining how and when a contaminant was released into the ground is a difficult and often impossible task. This case presented the court with conflicting evidence, none of which answers all the questions. In the end, however, the inconsistencies inherent in Exxon's theories convince this court that the possibilities tip in favor of New West's explanations. *See Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (explaining that under the preponderance standard, the party bearing the burden of proof loses if the evidence is evenly balanced). Exxon, therefore, has failed to satisfy its burden to prove, by a preponderance of the evidence, that a post-Closing Date release occurred and that Exxon did not cause the increased levels of contamination.

### 2. *Damages*

█ Because Exxon has not proved that it did not cause the increased levels of contamination, it is not entitled to damages. *See Mann v. Jackson*, 141 Cal. App.2d 6, 14, 296 P.2d 120 (1956) (noting that where "no breach of the contract could have been claimed ... no damages could have been awarded"); *see also Milton v. Hudson Sales Corp.*, 152 Cal.App.2d 418, 434, 313 P.2d 936 (1957) ("Uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damages, is fatal.").

█ Even if Exxon were able to prove a breach of the Agreement and the causation of damages, Exxon still has not carried its burden with respect to the calculation of such damages. *See San Diego Hous. Com v. Indus. Indem. Co.*, 68 Cal. App.4th 526, 537, 80 Cal.Rptr.2d 393 (1998) ("The plaintiffs have the burden of proving by a preponderance of the evidence all of the facts necessary to establish 'breach of contract' [including] the amount of the damages."). The court recognizes that, "once the cause and existence of damages have been ... established, recovery will not be denied because the damages are difficult of ascertainment." *Mardirossian & Assocs., Inc. v. Ersoff*, 153 Cal.App.4th 257, 269, 62 Cal.Rptr.3d 665 (2007). Nonetheless, California law still "requires that some reasonable basis of computation be used" in the measurement damages. *Milton*, 152 Cal.App.2d at 434, 313 P.2d 936; *see also Ross v. Frank W. Dunne Co.*, 119 Cal.App.2d 690, 701, 260 P.2d 104 (1953) (finding that damages "must not be based on pure speculation or conjecture").

Assuming Exxon had established that it did not cause an ascertainable share of the increased levels of contamination, paragraph 12(e) provides the method of calculating damages based on New West's obligation to reimburse Exxon for Exxon's continued remediation efforts. (Trial Ex. 37 at ¶ 12(e).) Specifically, the Agreement provides that New West's fractional cost is calculated based on the following formula:

Purchaser's fractional cost = 1—(A divided by B)

A = Estimated cost to complete remediation prior to Additional Contamination;
B = Estimated cost to complete remediation after Additional Contamination.

Example:

Estimated cost to complete remediation prior to Additional Contamination $100,000 (calculated at the time of Additional Contamination).

Estimated cost to complete remediation after Additional Contamination $150,000 (includes the $100,000 plus $50,000 in estimated costs related to Additional Contamination).

Purchaser's fractional cost equals: 1—(A divided by B), or 1–.667. Purchaser will pay one-third (.333) of remediation costs incurred after the Additional Contamination occurs.

(*Id.* at ¶ 12(e)(ii).) To prove its damages, therefore, Exxon had to provide sufficient evidence for the trier of fact to differentiate between the costs incurred due to Exxon's existing responsibility and New West's subsequent responsibility.

Exxon currently forecasts that it will spend $1.5 million in assessment, monitoring, and remediation efforts for the Property, but that only $540,000 of that amount constitutes the cost it would have incurred to remediate the 2,800 parts per billion of MTBE identified in the Delta Report. (Trial Trs. Sept. 14, 2007 36:5–9, Sept. 18, 2007 94:16–18, Sept. 20, 2007 4:2–17.) As the court found above, however, Exxon did not prove that its responsibility is limited to that concentration of contamination.[6] Moreover, even if the court could discern an amount of contamination attributable to New West without the Delta Report, Exxon's evidence of damages lacks a reasonable basis to distinguish which costs resulted from existing contamination and which were added due to subsequent releases that Exxon did not cause.

To quantify its assessment, monitoring, and remediation costs, Exxon submitted a two-page document that summarily lists the costs incurred and projected between 2000 and 2010. (Trial Ex. 73.) From this document, and the limited testimony of Exxon's witnesses, the court cannot reasonably differentiate between costs incurred to monitor the site, assess the extent of contamination, or remediate specific quantities of contamination. (*See* Trial Tr. Sept. 18, 2007 59:18–60:15 (Exxon's expert was unaware how much Exxon spent to comply with the County's directives to do additional assessments regarding the extent of the contamination and estimated that Exxon spent only about $200,000 for the installation of the groundwater extraction system); *see also* Trial Trs. Sept. 18, 2007 56:12–57:2 (Exxon's expert explained that the calculations were "based on our—experience," but did not offer evidence about costs incurred for comparable remediation efforts), Sept. 11, 2007 57:6–25 (an Exxon project manager described the budgeting process as reviewing the data and budgeting for

---

6. Exxon also bases its $540,000 calculation on the premise that, prior to the discovery of increased levels of contamination, it planned to remediate the 2,800 parts per billion of MTBE with natural attenuation, which is much less expensive than a groundwater extraction system. The court is unpersuaded, however, that Exxon ever had a concrete plan to remediate through natural attenuation. (*See, e.g.,* Trial Trs. Sept. 7, 2007 139:20–22, Sept. 11, 2007 171:1–8) (Exxon's project manager and environmental consultant never discussed the possibility of natural attenuation with the County), Sept. 7, 2007 140:20–141:6 (Exxon never performed the tests that would have determined whether natural attenuation was occurring), Sept. 11, 2007 32:8–22, 156:5–14 (Exxon's environmental consultant explained that he assumed active remediation would be required and never began drafting a remediation plan until early 2003).

"what you feel the future would be for this site").)

Therefore, even if Exxon was entitled to reimbursement from New West for the costs to remediate a subsequent release, Exxon has failed to carry its burden of apportioning—or providing the trier of fact with a method to apportion—the costs attributable to each party. *See Coprich v. Superior Court*, 80 Cal.App.4th 1081, 1092, 95 Cal.Rptr.2d 884 (2000) ("Plaintiffs bear the burden to establish damages resulting from the alleged breach.").

### C. Remaining Claims

The failure of Exxon's breach of contract claim against New West effectively extinguishes its additional claims for breach of the implied covenant of good faith and fair dealing, express indemnity, declaratory relief, and violations of California Business and Professions Code section 17200 (predicated on California's Health and Safety Code section 25296.10 and Water Code section 13260(a)). Specifically, each of these claims rely on Exxon's above-addressed allegations that there was an additional release of contamination that Exxon did not cause, triggering New West's contractual obligation to either remediate such contamination itself or proportionately reimburse Exxon's remedial efforts.

■■■ Likewise, equitable indemnity would be inappropriate here. There are two forms of equitable indemnity that might apply in this type of action. "Implied contractual indemnity" is premised upon the indemnitor's breach of duty owed to the indemnitee to perform its contractual duties properly. *Sehulster Tunnels/Pre–Con v. Traylor Bros., Inc./Obayashi Corp.*, 111 Cal.App.4th 1328, 1350, 4 Cal.Rptr.3d 655 (2003). Alternatively, "tort-based indemnity" stems from a duty of due care to an injured party and usually involves a breach of that duty, and thus only applies when the indemnitor and indemnitee are jointly and severally liable to an injured third party (here, the government). *W. Steamship Lines, Inc. v. San Pedro Peninsula Hosp.*, 8 Cal.4th 100, 116, 32 Cal.Rptr.2d 263, 876 P.2d 1062 (1994). Under either form, a given party's liability for equitable indemnity is based on, and apportioned by, its proportional share of responsibility for the damages. *Bay Dev., Ltd. v. Superior Court*, 50 Cal.3d 1012, 1030–31, 269 Cal.Rptr. 720, 791 P.2d 290 (1990).

■■■ Exxon contends that equitable indemnification is appropriate in the instant matter because it has "satisfied more than its share" of the damages and thus "is now entitled to a proportionate contribution from New West." (Exxon's Post–Trial Br. 30:25–31:1.) Exxon is not entitled to implied contractual indemnity because Exxon and New West "expressly contracted with respect to the duty to indemnify, [thus] the extent of the duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity." *Rossmoor Sanitation, Inc. v. Pylon, Inc.*, 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97 (1975).

Even if Exxon proved that there was a post-Closing Date release that it did not cause and the court determined that equitable considerations justified application of tort-based equitable indemnity, Exxon has not provided sufficient evidence to prevail on such a claim. Specifically, because Exxon has not carried its "stringent burden" in showing a reasonable or practical division of damages entitling it to equitable apportionment among joint-tortfeasors, *O'Neil v. Picillo*, 883 F.2d 176, 183 (1st Cir.1989), the court "should not hasten to 'split the difference' in an attempt to achieve equity" or "settle on a compromise amount that they think best approximates

the relative responsibility of the parties." *United States v. Atchison, Topeka & Santa Fe Ry. Co.,* Nos. 92–5068, 96–6226, 96–6228, 2003 WL 25518047, at *84 (E.D.Cal. July 15, 2003) (citation omitted). Rather, " '[i]n such circumstances, courts lacking a reasonable basis for dividing causation should avoid apportionment altogether.' " *Id.* (citation omitted); *see also United States v. Burlington N. & Santa Fe Ry. Co.,* 520 F.3d 918, 945–46 (9th Cir.2008) ("Apportionment is the exception, available only in those circumstances in which adequate records were kept and the harm is meaningfully divisible."); *FMC Corp. v. Vendo Co.,* 196 F.Supp.2d 1023, 1034 (E.D.Cal.2002) (recognizing that, because "[p]roving divisibility is a 'very difficult proposition,' " courts are "caution[ed] against making an 'arbitrary apportionment for its own sake' ").

Similarly, in light of the court's determination on Exxon's claims against New West, New West's counterclaims against Exxon and crossclaim against Bains are moot.

■ Bains' remaining claims for equitable indemnity, alleged against New West and Exxon, also lack viability. Because Bains' contract and assignment with New West contains its own purportedly valid and applicable express indemnification provisions, the court cannot rely on implied contractual indemnity. *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97 (1975) ("[Where] the parties have expressly contracted with respect to the duty to indemnify, the extent of the duty must be determined from the contract and not by reliance on the independent doctrine of equitable indemnity."). Nor can Bains rely on implied contractual indemnity to support his claim against Exxon because Bains did not have a contractual relationship with Exxon. With respect to tort-based equitable indemnity, Bains did not persuade this court that equitable considerations justify the court in providing greater protection than Bains had bargained for in his contract with New West.

IT IS THEREFORE ORDERED that each of the parties take nothing on their respective claims, counterclaims, and crossclaims enumerated in this Order.

The Clerk of the Court is directed to enter judgment accordingly.